**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| PAUL BELLRENG, | : | |
| | | Civil Action No. 08-5250 (RBK) |
| Petitioner, | : | |
| v. | : | **OPINION** |
| J. GRONDOLSKY, | : | |
| Respondent. | : | |

**APPEARANCES:**

| | |
|---|---|
| Petitioner pro se | Counsel for Respondent |
| Paul Bellreng | Paul A. Blaine |
| FCI Fort Dix | Asst. U.S. Attorney |
| P.O. Box 2000 | 401 Market Street |
| Fort Dix, NJ 08640 | 4th Floor |
| | Camden, NJ 08101 |

**KUGLER**, District Judge

Petitioner Paul Bellreng, a prisoner currently confined at the Federal Correctional Institution at Fort Dix, New Jersey, has submitted a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241[1] and an application for leave to proceed in forma pauperis. The sole respondent is warden J. Grondolsky.

---

[1] Section 2241 provides in relevant part:

(a) Writs of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective jurisdictions.
(c) The writ of habeas corpus shall not extend to a prisoner unless-- ... (3) He is in custody in violation of the Constitution or laws or treaties of the United States ... .

Because it appears from a review of the Petition, the Answer, and the attachments thereto, that Petitioner is not entitled to relief, the Petition will be denied.  See 28 U.S.C. § 2243.

### I.   BACKGROUND

Petitioner was convicted, pursuant to a plea agreement, in the U.S. District Court for the Western District of New York on one count of racketeering, in violation of 18 U.S.C. § 1962(d).  See United States v. Bellreng, Crim. No. 02-0073 (W.D.N.Y.).  In pertinent part, the plea agreement provided:

> 1.   The defendant agrees to plead guilty to Count One of the Second Superseding Indictment (hereinafter, "Indictment"), which count charges a violation of title 18, United States Code, Section 1962(d) (Racketeering conspiracy) and which carries a maximum possible sentence of a term of imprisonment of 20 years, a fine of $250,000, or both, a mandatory $100 special assessment, and a term of supervised release of up to 3 years. ...
>
> 6.   The defendant and the government agree to the following facts, which form the basis for the entry of the plea of guilty including relevant conduct:
>
>> Commencing in approximately 1996, the exact date being unknown, and continuing thereafter up to and including May 15, 2002, in the Western District of New York, the defendant, PAUL BELLRENG, together with ... other members of a labor union known as Laborers International Union of North America, Local 91, (hereinafter, "Local 91") whose identities are known to the parties, constituted an enterprise as that term is defined in title 18, United States Code, Section 1961(4); namely, a group of individuals and a labor union associated-in-fact, which enterprise was engaged in and the activities of which affected interstate commerce.

The principal objective of the enterprise in which the defendant and others participated consisted of illegally seeking to obtain and obtaining property by acts and threats involving extortion. The property sought to be obtained and obtained consisted of jobs performed on construction projects in Niagara County, New York, and the payment of wages and benefits associated with those jobs. The defendant and other members of the enterprise obtained and attempted to obtain such property from union and non-union construction contractors, and from union and non-union employees and laborers. In the time period of 1996 through May, 2002, the defendant at different times served as steward and picket captain for Local 91.

In furtherance of the conspiracy charged in Count One of the Indictment, and as described further in Racketeering Acts Three and Four, in approximately late November or early December, 1996, Dominick Dellaccio told Tim Mulvey, owner of Mulvey Construction Company, Inc., that Dellaccio wanted the Mulvey construction projects in Lockport, New York, to be performed by Local 91 members. When, in December, 1996, Mulvey began using his non-union employees to perform a construction project at 144 Main Street, Lockport, New York, Local 91 members established a picket line around 144 Main Street and threatened, followed, and threw various projectiles at Mulvey employees. Local 91 picketers also committed acts of vandalism and property destruction to property belonging to the Mulvey company, as well as employees of Mulvey. The defendant was aware of the actions of the Local 91 picketers at 144 Main Street, and agreed with the use of such tactics. The defendant also participated with other Local 91 members at a picket outside Mulvey's residence. The purpose of these activities was to intimidate Mulvey and its employees so as to obtain from Mulvey and its employees the jobs being performed by them in Lockport, New York, and the wages and benefits associated with those jobs.

In furtherance of the conspiracy charged in Count One of the Indictment, and as charged in Racketeering Acts Five and Six, in or about March

>and April 1997, the defendant and other Local 91 members set up a picket line at the Drinking Water Treatment Plant (DWTP) in Niagara Falls, New York. At the time, employees of Sansla, Inc., were performing an asbestos removal project at the DWTP and were not members of any labor union. The defendant was the picket captain for the picket line at the DWTP, and, as a result, supervised the activities of the Local 91 picketers. During the course of the picket, the defendant, along with other Local 91 members, made threats of death and bodily injury against the Sansla employees, threw projectiles (including rocks, pieces of pipe, and glass bottles) at the Sansla employees, and damaged property at the DWTP work site (including the equipment and materials used for the asbestos removal project).
>
>In addition, Local members Mark Congi, and others, followed the Samsla employees on numerous occasions as such employees left the work site in an attempt to intimidate and instill fear in the Sansla employees. Other Local 91 members – under the supervision of the defendant – repeatedly threatened and harassed Sansla employees, blocked the Sansla employees' access to and exit from the work site, and damaged property belonging to Sansla. The defendant and other Local 91 picketers engaged in these acts for the purpose of attempting to instill fear in the minds of the Sansla employees in an effort to obtain from Sansla and its employees property consisting of the work being performed by the non-union Sansla employees, and the payment of wages and benefits associated with those jobs.
>
>The above facts are set forth for the limited purpose of complying with rule 11(f) and are not intended to serve as a complete statement of the defendant's criminal conduct. ...

8. The government and the defendant agree that the following specific offense characteristics apply:

   a. With respect to the attempted extortion of Sansla and its employees, a two-level increase pursuant to Guidelines § 2B3.2(b)(1) for express or implied threat of death; ...

>10.  ...  In addition, the parties agree that the defendant should receive a three (3) level upward adjustment pursuant to Guidelines § 3B1.1(b) because the defendant was a manager or supervisor of criminal activity charged in Count One, and that such activity involved five or more participants.

(Answer, Ex. 7.)[2]

---

[2] The relevant portions of the Pre-Sentence Investigation Report, attached in redacted form as Exhibit 6 to the Answer, reflect that Petitioner, along with other Local 91 members, intentionally "promoted a climate of fear through violence and threats of violence, "made threats of death and bodily injury against the Sansla employees, threw projectiles (including rocks, pieces of pipe, and glass bottles) at the Sansla employees, and damaged property... ," that Local 91 members under the supervision of Petitioner, "repeatedly threatened and harassed Sansla employees," and that Petitioner and others "engaged in these acts for the purpose of attempting to instill fear in the minds of the Sansla employees ... ."  (PSR at ¶¶ 27, 28, 29.)  In addition, there was evidence that Local 91 picketers "would throw rocks at the trucks and throw rocks at the employees while they were on scaffolding and also throw metallic stars or a garden hose with 2-1/2 inch roofing nails in them on the ground in an effort to puncture vehicle tires.  It was also revealed that early on in the job, there was an individual video taping all the employees as they entered and exited the job site, video taping their license plates and all of the employees entering the site which occurred for approximately one week.  Mr. Mulvey believed this to be attempts at intimidation as later, things were said to the employees by other individuals that they had video taped and they knew where the employees lived."  (PSR at ¶ 31.)  In addition, "individuals reported that Paul Bellreng and Albert Celeste were on site at the picket line on approximately every work day along with other Local 91 members. [The witness] advised that on the second day of the project, he saw approximately 8 picketers throwing rocks and golf balls across the fence and also balls embedded with nails."  (PSR at ¶ 35.)  Finally, another witness "testified that on the morning of April 21, 1997, Paul Bellreng, after exiting Celeste's vehicle, called him by his name and told him he was going to take his head off.  Later on that evening he returned to his apartment and sometime after 11:00 p.m. he heard an explosion and upon attempting to enter into the hallway, a second explosion occurred which threw him across the hallway into the next bedroom."  (PSR at ¶ 37.)  "It is noted, however, that there is no evidence to reflect the defendant had

5

At the sentencing hearing on November 22, 2006, counsel for the government represented to the court that the government did not consider Petitioner to be a physical risk to anyone. (Petition, Ex. B.)  The court sentenced Petitioner to a term of imprisonment of 56 months, to be followed by a two-year term of supervised release.  The court permitted Petitioner to voluntarily surrender to the Bureau of Prisons after January 1, 2007.  The court made the following recommendation:

> The Court believes the defendant does not pose a risk to public safety and recommends classification of the defendant to the lowest (minimum) facility and waiver of the "public safety factor" based upon the crime of conviction.  The Court further recommends designation and placement in the prison camp facility at McKean, PA, or as close to the Buffalo area as possible.

(Answer, Ex. 9, Judgment.)

Contrary to the sentencing court's recommendation, the Bureau of Prisons assigned Petitioner a "Greatest Severity Public Safety Factor" in accordance with the terms of the controlling Program Statement 5100.08, <u>Security Designation and Custody</u>.  The BOP also determined, in accordance with the terms of 28 C.F.R. § 550.58(a), that Petitioner is not eligible for early release consideration under 18 U.S.C. § 3621(e)(2)(B), related to successful completion of a Residential Drug Abuse Treatment Program, as a result of the events underlying his current offense

---

prior knowledge of the attack on the evening of April 21, 1997." (PSR at ¶ 30.)

and the fact that there was a two-point Special Offense Characteristic enhancement of Petitioner's sentence for threats of bodily injury.  On December 29, 2006, the BOP notified the sentencing court in writing that it was unable to follow the court's recommendations, that it had determined that a waiver of the Public Safety Factor would nto be appropriate based on the nature of the offense, that Petitioner had been classified as a low security level offender, and that he had been designated to the Allenwood low security level correctional facility in White Deer, Pennsylvania.  (Answer, Ex. 8.)  Petitioner surrendered to BOP authorities on January 19, 2007.  His projected release date, taking into account anticipated good conduct time, is February 10, 2011.

Here, Petitioner contends that (1) the BOP "improperly" imposed a Public Safety Factor, contrary to the sentencing judge's recommendation and the plea agreement,[3] (2) resulting in his confinement in a higher security institution, and (3) rendering him ineligible for early release consideration under 18 U.S.C. § 3621(e)(2)(B).

---

[3] Contrary to Petitioner's contention, nothing in the Plea Agreement refers to or restricts the discretion of the BOP to house Petitioner in any particular facility, to assign any particular classification level, or to determine his eligibility for early release upon successful completion of the Residential Drug Abuse Treatment Program.

Respondent admits that Petitioner has exhausted his administrative remedies with respect to the claims asserted here.[4]  Respondent argues that the BOP properly applied a Greatest Severity Public Safety Factor to Petitioner, properly assigned him to a low security level institution, and properly denied him eligibility for early release.  Briefing is complete and this matter is now ready for decision.

## II.   STANDARDS APPLICABLE TO PRO SE PLEADING

A pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers.  Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520 (1972). A pro se habeas petition and any supporting submissions must be construed liberally and with a measure of tolerance.  See Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998); Lewis v. Attorney General, 878 F.2d 714, 721-22 (3d Cir. 1989); United States v. Brierley, 414 F.2d 552, 555 (3d Cir. 1969), cert. denied, 399 U.S. 912 (1970).

## III.   ANALYSIS

A.   Jurisdiction

A habeas corpus petition is the proper mechanism for a federal prisoner to challenge the "fact or duration" of his confinement, Preiser v. Rodriquez, 411 U.S. 475, 498-99 (1973),

---

[4] Respondent did not provide this Court with a copy of the administrative remedy record.

including challenges to prison disciplinary proceedings that affect the length of confinement, such as deprivation of good time credits, Muhammad v. Close, 540 U.S. 749 (2004) and Edwards v. Balisok, 520 U.S. 641 (1997).  See also Wilkinson v. Dotson, 125 S.Ct. 1242 (2005).  In addition, where a prisoner seeks a "quantum change" in the level of custody, for example, where a prisoner claims to be entitled to probation or bond or parole, habeas is the appropriate form of action.  See, e.g., Graham v. Broglin, 922 F.2d 379 (7th Cir. 1991) and cases cited therein.  See also Woodall v. Federal Bureau of Prisons, 432 F.3d 235, 237 (3d Cir. 2005) (challenge to regulations limiting pre-release transfer to community corrections centers properly brought in habeas); Macia v. Williamson, 2007 WL 748663 (3d Cir. 2007) (finding habeas jurisdiction in challenge to disciplinary hearing that resulting in sanctions including loss of good-time credits, disciplinary segregation, and disciplinary transfer).

    The Court of Appeals for the Third Circuit has held that habeas corpus is an appropriate mechanism, also, for a federal prisoner to challenge the execution of his sentence.  See Coady v. Vaughn, 251 F.3d 480, 485-86 (3d Cir. 2001) (noting that federal prisoners may challenge the denial of parole under § 2241); Barden v. Keohane, 921 F.2d 476, 478-79 (3d Cir. 1990) (challenge to BOP refusal to consider prisoner's request that

state prison be designated place for service of federal sentence).

The Court of Appeals has noted, however, that "the precise meaning of 'execution of the sentence' is hazy." Woodall, 432 F.3d at 237. Distinguishing Woodall, the Court of Appeals has held that a challenge to a garden-variety transfer is not cognizable in habeas. See Ganim v. Federal Bureau of Prisons, 235 Fed.Appx. 882, 2007 WL 1539942 (3d Cir. 2007).

Here, however, Petitioner's is not a garden-variety challenge to his classification and place of confinement, which would not ordinarily be cognizable in habeas. Instead, he alleges that the classification, itself, limits his eligibility for consideration for early release, a challenge that goes to the length of his confinement. Accordingly, this Court may exercise jurisdiction in habeas to consider Petitioner's claim.

B.   Petitioner's Classification and Place of Confinement

With respect to convicted and sentenced prisoners, "[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight." Montanye v. Haymes, 427 U.S. 236, 242 (1976), quoted in Hewitt v. Helms, 459 U.S. 460, 468 (1983), and Sandin v. Conner, 515 U.S. 472, 480 (1995).

Governments may confer on prisoners liberty interests that are protected by the Due Process Clause. "But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin, 515 U.S. at 484 (finding that disciplinary segregation conditions which effectively mirrored those of administrative segregation and protective custody were not "atypical and significant hardships" in which a state conceivably might create liberty interest). See also Asquith v. Department of Corrections, 186 F.3d 407, 411-12 (3d Cir. 1999) (return to prison from halfway house did not impose "atypical and significant hardship" on prisoner and, thus, did not deprive him of protected liberty interest).

It is well established that a prisoner possesses no liberty interest arising from the Due Process Clause in a particular custody level or place of confinement. See, e.g., Olim v Wakinekona, 461 U.S. 238, 245-46 (1983); Hewitt, 459 U.S. at 466-67; Moody v. Daggett, 429 U.S. 78, 88 n.9 (1976); Meachum v. Fano, 427 U.S. 215, 224-25 (1976); Montanye, 427 U.S. at 242. Thus, for example, there is no there is no due process violation

11

in assigning prisoner a Sex Offender Public Safety Factor.  See Day v. Nash, 191 Fed.Appx. 137, 2006 WL 2052335 (3d Cir. 2006).

Similarly, here, Petitioner has no liberty interest in avoiding the assignment to him of a Greatest Severity Public Safety Factor.  The sentencing judge's recommendation is just that, a recommendation, not binding on the Attorney General or the Bureau of Prisons, to whom Congress has delegated the authority to determine a prisoner's appropriate classification and place of confinement.  See, e.g., 18 U.S.C. § 3621; 28 C.F.R. § 0.96; BOP Program Statement 5100.08, Inmate Security Designation and Custody Classification.  The recommendation of the sentencing court is only one, among several, factors that the BOP must consider in making its classification and custody decision.  Petitioner has not established that the decisions to assign him a Greatest Severity Public Safety Factor, and to assign him to a low-security institution, have subjected him to "atypical and significant" hardship.  Cf. Marti v. Nash, 2006 WL 840397, *3 (D.N.J. March 27, 2006), aff'd, 227 Fed.Appx. 148, 2007 WL 1072969 (3d Cir. 2007) (prisoner, whose assignment to PSF of Greatest Severity prevented his placement at minimum security level facility, had no due process right to any particular security classification); Day v. Nash, 2005 WL 2654089, *2-3 (D.N.J. Oct. 12, 2005), aff'd, 191 Fed.Appx. 137 (3d Cir. 2006) (no due process violation in assignment of Sex Offender PSF).

To the extent the Petition could be read as arguing that the BOP's assignment to Petitioner of a Greatest Severity Public Safety Factor is "arbitrary and capricious" in violation of § 706 of the Administrative Procedure Act, Congress has precluded judicial review of such claims.[5] See 18 U.S.C. § 3625. See also Burnam v. Marberry, 313 Fed.Appx. 455, 456, 2009 WL 449151, 1 (3d Cir. 2009); Martin v. Gerlinski, 133 F.3d 1076, 1079 (8th Cir. 1998).[6]

Accordingly, Petitioner has failed to establish any due process violation in the assignment to him of the Greatest Severity Public Safety Factor or in the assignment to a low-security facility.

C.   Petitioner's Eligibility for Early Release

Petitioner's final argument is that the assignment of the Greatest Severity PSF deprives him of eligibility for early release upon completion of the BOP's Residential Drug Abuse

---

[5] Petitioner's citation to Arrington v. Daniels, 516 F.3d 1106 (9th Cir. 2008), in support of this argument is inapt. Arrington involved judicial review of agency rulemaking. Absent from § 3625 is an exclusion of the rulemaking provisions of the Administrative Procedure Act under 5 U.S.C. § 553. Accordingly, § 3625 does not prohibit judicial review of BOP rulemaking. See Martin v. Gerlinski, 133 F.3d 1076, 1079 (8th Cir. 1998).

[6] In any event, there appears to be no abuse of discretion here. Pursuant to P.S. 5100.08, Appendix A, Petitioner was properly assigned the Greatest Severity Public Safety Factor because his offense was extortion involving a weapon or threat of violence. Pursuant to P.S. 5100.08, Chapter 5, as an inmate with a Greatest Severity Public Safety Factor, he was properly assigned to at least a low-security level institution.

Treatment Program. Again, the Court construes this as a claim that the BOP deprived Petitioner of liberty without due process in denying him eligibility for early release.

In 1990, Congress required the Bureau of Prisons to "make available appropriate substance abuse treatment for each prisoner the Bureau determines has a treatable condition of substance addiction or abuse." Crime Control Act of 1990, Pub.L. 101-647, § 2903, 104 Stat. 4789, 4913 (codified as amended at 18 U.S.C. § 3621(b)). In 1994, Congress amended the statute to provide an incentive for prisoner participation. The incentive provision reads:

> The period a prisoner convicted of a nonviolent offense remains in custody after successfully completing a treatment program may be reduced by the Bureau of Prisons, but such reduction may not be more than one year from the term the prisoner must otherwise serve.

Violent Crime Control and Law Enforcement Act of 1994, Pub.L. 103-322, § 32001, 108 Stat. 1796, 1897 (codified at 18 U.S.C. § 3621(e)(2)(B)).

The regulation in effect at the time Petitioner became eligible for consideration read, in pertinent part, as follows:

> Consideration for early release.
>
> An inmate who was sentenced to a term of imprisonment pursuant to the provisions of 18 U.S.C. Chapter 227, Subchapter D for a nonviolent offense, and who is determined to have a substance abuse problem, and successfully completes a residential drug abuse treatment program during his or her current commitment may be eligible, in accordance with paragraph (a) of

>    this section, for early release by a period not to exceed 12 months.
>
>    (a)   Additional early release criteria.
>
>    (1) As an exercise of the discretion vested in the Director of the Federal Bureau of Prisons, the following categories of inmates are not eligible for early release:
>
>    ...
>
>    (vi) Inmates whose current offense is a felony:
>
>    (A) That has as an element, the actual, attempted, or threatened use of physical force against the person or property of another, ...

28 C.F.R. § 550.58 (2000).

It is generally conceded that § 3621(e)(2)(B) does not create a liberty interest in early release.  See, e.g., Handley v. Chapman, 2009 WL 3468790 (5th Cir. 2009); Staszak v. Romine, 221 F.3d 1344, 2000 WL 862836 (8th Cir. 2000); Cook v. Wiley, 208 F.3d 1314 (11th Cir. 2000); Fristoe v. Thompson, 144 F.3d 627 (10th Cir. 1998); Orr v. Hawk, 156 F.3d 651, 654 (6th Cir. 1998); Piccolo v. Lansing, 939 F.Supp. 319, 320 (D.N.J. 1996); Hilstrom v. Morris, 1996 WL 568842, *3 & n.3 (D.N.J. 1996).  See also Greenholtz v. Inmates of Nebraska Penal and Correctional Complex, 442 U.S. 1, 7 (1979) (there is no constitutional right to be released from prison before the completion of a valid sentence).

As evidenced by the Program Notice advising Petitioner of his eligibility to participate in the program and his ineligibility for early release, (Answer, Ex. 5), Petitioner was

denied eligibility for early release because of "current offense, along with 2 pt. enhancement for threats of bodily injury," in accordance with the controlling regulation.  Accordingly, Petitioner has failed to establish any entitlement to relief.

Finally, this Court does not read the Petition as challenging the validity of the regulation at 28 C.F.R. § 550.58 as "arbitrary and capricious."  Cf. Arrington v. Daniels, 516 F.3d 1106 (9th Cir. 2008) (holding that § 550.58 is "arbitrary and capricious" because the rationale for it is not discernible from the administrative record).  To the extent the Petition could be read as making such an argument, it is meritless.

The APA's "arbitrary and capricious" standard of review is "narrow."  A federal court may "find that an action is arbitrary and capricious if the agency relied on facts other than those intended by Congress, did not consider 'an important aspect' of the issue confronting the agency, provided an explanation for its decision which 'runs counter to the evidence before the agency,' or is entirely implausible."  Rite Aid of Pennsylvania, Inc. v. Houstoun, 171 F.3d 842, 853 (3d Cir. 1999) (quoting Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43-44 (1983)).  Moreover, a federal court "must 'uphold [an agency's] decision of less than ideal clarity if the agency's path may reasonably be discerned.'"  Rite Aid, 171 F.3d at 853 (quoting Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43) (internal

citations omitted). Indeed, "on occasion, regulations with no statement of purpose have been upheld where the agency's purpose was considered obvious and unmistakable." Citizens to Save Spencer County v. U.S. Environmental Protection Agency, 600 F.2d 844, 884 (D.C. Cir. 1979) (emphasis added) (quoted with approval in Muolo v. Quintana, 2009 WL 82491 (W.D. Pa. Jan. 8, 2009)).

Virtually every court to consider the matter has rejected the rationale of Arrington and upheld the validity of § 550.58. See Snipe v. Dept. of Justice, 2008 WL 5412868 (N.D.W.Va. Dec. 23, 2008) (collecting cases). The Court of Appeals for the Sixth Circuit has held that the Supreme Court's Lopez[7] decision "does directly control" the argument that this challenged regulation is arbitrary. See Harrison v. Lamanna, 19 Fed.Appx. 342, 2001 WL 1136080 (6th Cir. 2001). See also Cushenberry v. Federal Medical Center, 530 F.Supp.2d 908, 913 (E.D. Ky. 2008) (same); Robinson v. Gonzaales, 493 F.Supp.2d 758, 763-64 (D. Md. 2007) (same);

---

[7] In Lopez v. Davis, 531 U.S. 230, 240 (2001), the Supreme Court agreed with the Bureau of Prisons' argument that "the agency may exclude inmates either categorically or on a case-by-case basis, subject of course to its obligation to interpret the statute reasonably, see Chevron[ v. Natural Resources Defense Council, 467 U.S. 837, 884 (1984)], in a manner that is not arbitrary or capricious, see 5 U.S.C. § 706(2)(A)." The Court went on, "Having decided that the Bureau may categorically exclude prisoners based on their preconviction conduct, we further hold that the [1997 interim regulation] is permissible. The Bureau reasonably concluded that an inmate's prior involvement with firearms, in connection with the commission of a felony, suggests his readiness to resort to life-endangering violence and therefore appropriately determines the early release decision." 531 U.S. at 244 (footnote omitted).

Chevrier v. Marberry, 2006 WL 3759909, *4-5 (E.D. Mich. 2006) ("There is nothing unreasonable in the BOP's common-sense decision that there is a significant potential for violence from criminals who possess firearms.").

This Court agrees that the Lopez decision directly controls the conclusion that this challenged regulation, which is identical to the 1997 interim regulation at issue in Lopez, is not "arbitrary and capricious" in violation of the APA.

To the extent Lopez does not directly control the issue, this Court agrees with Chief Magistrate Judge Baxter, of the Western District of Pennsylvania, that the Bureau's public safety rationale can be reasonably discerned from all of the categorical exclusions contained in the same regulation, including discretionary categorical exclusions of: "(1) inmates who have a prior felony or misdemeanor conviction for homicide, forcible rape, robbery, or aggravated assault, or child sexual abuse offenses; (2) inmates whose current offense is a felony that has as an element the actual, attempted, or threatened use of physical force against the person or property of another; (3) inmates whose current offense is a felony that by its nature or conduct presented a serious potential risk of physical force against the person or property of another; and, (4) inmates whose current offense is a felony that by its nature or conduct involves sexual abuse offenses committed upon children. 28

U.S.C. § 50.58(a)(1)(iv), (vi)(A), (C)-(D)," as well as the categorical exclusion of inmates whose current offense involved the carrying, possession, or use of a firearm or other dangerous weapon or explosives.  Muolo, 2009 WL 82491, *10.  Finally, this Court agrees that it is telling that none of the 150 commenters to the proposed rule challenged the rule on the basis that there was no public safety rationale to support the categorical exclusions contained in the rule.  Id.  Thus, the rationale for the categorical exclusions contained in the regulation can be reasonably discerned from the administrative record and the regulation is not "arbitrary or capricious."  See also Gatewood v. Outlaw, 560 F.3d 843, 846 -848 (8th Cir.  2009) (rejecting the Arrington standard that the rationale for agency action, in a rulemaking case, must appear "on the record").  The rationale for the challenged regulation here is fully stated in the history appended by the BOP to the 1997 interim regulation and the litigation and events referenced therein.

## IV. CONCLUSION

   For the reasons set forth above, the Petition will be denied.  An appropriate order follows.


                                        s/Robert B. Kugler
                                        Robert B. Kugler
                                        United States District Judge

Dated: December 11, 2009